The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. We have three cases set for oral argument this morning. Our first case is ComScope Technologies LLC v. Dali Wireless Inc. No. 20-1817. Mr. Kaspers, you reserve four minutes, five minutes of time for rebuttal. Is that correct? That's correct. Thank you. And Mr. Davis, you reserve three on the cross appeal. Yes, your honor. Okay. We're all set to begin. Mr. Kaspers, you may start, please. Yes. May it please the court, on ComScope's appeal, I will start with Dali's 521 patent and address the issues of infringement and anticipation by Wright at the same time. Those issues are tied together. Now, recall Wright is the prior art reference that, like ComScope's product, employs a selector switch that toggles between multiple power amplifiers. Also recall that Dali's 521 patent requires a controller and that the controller be turned off. And here is the point I want to emphasize, is that Dali takes two contradictory interpretations of that controller limitation in its response brief. First, at page 47, to avoid anticipation by Wright, Dali says the claim requires the controller itself must be put into a non-operating state, turned off. Dali said, quote, claim one of the 521 patent requires a controller that controls a switch and places itself and the switch in a non-operating state in order to disconnect the power amplifier. Mr. Kaspers, I have a quick question, which is, what is the alleged controller in Wright or in your product? It's not the switch, is it, or is it something in addition? That's correct. It's not the switch. It's not the switch. And the controller, to be clear, the controller in Wright is element 70 in Wright figure 33, and we pointed that out in our brief at page 42, footnote 7. And they had no response to that. So, again, getting back to the two positions they took, first they took one at page 47 for anticipation, then at 44, page 44, Dali argued the exact opposite when addressing infringement. After conceding that Comscope's controller is continuously operating, on page 44 of the brief, Dali takes the position on the same page in footnote 10 that, quote, that the controller itself must be turned off is also literal nonsense, end quote. These are Dali's own words. For anticipation, Dali stressed the controller itself must be turned off, but for infringement, Dali stressed that requiring the controller itself be turned off is nonsense and not required. Look, Dali can't have it both ways. The infringement should be overturned. Turning to the issue whether BOWDER anticipates, I have one point on BOWDER, and recall BOWDER is the reference that includes a training circuit in the loop, in precisely the same location as the controller in the 521 patent. It's located at the end of the feedback loop by the lookup table that's being updated. Now, the point I want to emphasize is this is not a battle of the experts. Dali is relying on a conclusory opinion of an expert that contradicts the express teachings of the BOWDER reference. BOWDER Figure 2 has expressed arrows that undeniably show how the feedback signal connects to the lookup table. And Dali's expert didn't provide a different interpretation of the arrows in Figure 2 or how the feedback signal connects to the lookup table. Dali's expert just failed to give any explanation as to how the signal would remain connected to the lookup table when the training circuit is off. And to be clear, you can see BOWDER Figure 2 at page 45 of CommScope's lead brief. We added highlighting on top of the arrows to show, one, the feedback path, the path of the feedback signal. Two, the training circuit is in that path. And finally, the training circuit is the specific structure that connects the feedback signal to the lookup table. So, to be clear, Dali admitted in JMOL briefing at Appendix 26-108 that BOWDER's training circuit can be switched on and off between an operating state on and a non-operating state off. And looking at Figure 2 and following the arrows, when the training circuit is switched off and stops operating, the feedback signal will not reach the lookup table. Updating of the lookup table stops. Again, this is not a battle of the experts. This is Judge Stoll again. I'm wondering, you know, I'm looking at the expert's testimony at JA28354. I mean, there's a little bit of a discussion here in talking about, you know, getting some feedback and having a transmitter and, you know, talking about how you can't disconnect the feedback path.  I mean, we are talking about a driver here. So why – that doesn't sound so conclusory to me. Well, if you turn off the power to the training circuit, the feedback signal can't reach the lookup table. You don't update. And more importantly, their own expert explained how – what happens when you turn off the power in the 521 pad. It stops updating the lookup table. And the court's construction of turning off means put into a non-operating state. That's expressly what Bowder discloses. Bowder expressly discloses that you put the controller in a non-operating state after you completed the training phase. And to be clear – But this is – Go ahead. Why do you say that if you're in this non-operative state that the – for example, that the FWP is no longer transmitting a signal? Well, it's got no power. It's non-operating. It has no power. I mean, that's one of the advantages of turning it off is you conserve power. And both Bowder and the 521 discuss that advantage. So here's the way I look at it. It's – Turning off the signal doesn't necessarily mean that you turned off the entire PA. Is that what you're saying? Well, you're not turning off – yeah. The point is you're disconnecting the feedback signal from the lookup table. That's what the 521 patent discloses. And it's the controller that disconnects the feedback signal from the lookup table in the 521 patent. And in Bowder, it's the training circuit that disconnects the signal from the lookup table. So the controller, when you switch it off, it disconnects a signal that's representative of the output of the PA, right? That's exactly right. Okay. Doesn't require switching off the entire signal from the PA. That's right. So let me turn to Dolly's 473 patent. Recall that the asserted claims require the host to transmit different subsets – Just a second. To transmit different subsets to different remotes. And Comscope's brief at 74, page 74, challenged Dolly to identify any disclosure in the specification that supports the ordinary meaning of host to transmit different subsets to different remotes. As illustrated, for example, in concept B in our briefs. And Dolly didn't do so. Instead, it attempts to cure this lack of support by arguing for a new interpretation and frames the dispositive issue as a legal one. Dolly's new interpretation effectively replaces transmits with manages. And Dolly now says the host does not actually have to transmit the different subsets. It says it's sufficient for the host to transmit all available carriers to each remote, but then manage the software settings of each remote so that each remote can select out its own subsets and output those to its antenna. That's a different concept. It didn't claim that. That was the subject of Claim 1. I guess the point is they didn't claim the host manages. They claimed the host transmits different subsets. Dolly's argument ignores the ordinary meaning of host to transmit different subsets and tries to erase the intrinsic record. I'll defer to our briefs. I think they're very clear on the intrinsic record and what they relied on in IPR to distinguish the art. Before you sit down, let me find out if my colleagues have any outstanding questions. There's a lot of moving parts to this appeal, and I want to make sure we get to cover everything we want to. Okay. Thank you, Judge Rayna. This is Judge Stoll. I do have one question. It's actually about the spot and the anticipation issue. And I was wondering if you had a view on what signal Dr. Bims was referring to when he was saying that the signals were all the same, and that's what a simulcast system is. If you were to look, for example, at your brief, the blue brief, page 83, looking at that figure six on there, what signal do you think he was saying was the same? I'll ask your opposing counsel the same question. I'm not sure I understand the question. I know their position at trial was that you had to be able to – oh, yeah, okay, I've got the figure right here. So they were trying to say that their system requires the remote to be able to select out individually, one by one, the resources and be able to send them individually to any specific remote. And that was a construction that was rejected by the PTAB and the district court. In fact – Can I ask you a more pointed question? Yes. When they say that, you know, the signals are the same, are they saying that the box labeled, I think it's sector one, and it's blue, and then there's sector two that's green, and then sector K that's red, are they saying that those different sectors are all receiving the same signal? Is that what they're actually saying? No. No? Okay. No. All right. Thank you. Counselor, I have a question on the written description and enablement arguments that you've raised, and that's whether they've been waived or not. Can you address that quickly? Oh, absolutely. If anybody waived it, it's Dolly. We've taken the same position from the beginning of this case of what it means. Did you present these arguments during the Markman hearing? No. We went with the plain and ordinary meaning, and incidentally, they agreed with it. If you look at the IPR, they were taking the same interpretation as we did, the plain and ordinary meaning, Your Honor. Yeah, you seem to rely quite a bit on the IPR, but I seem to recall that that decision was vacated, although on ArcDirect, but nonetheless, it was vacated. It has no applicability at this time. That's a good question, Your Honor, but the record is still there. It's still part of the prosecution record. And so I do have two quick points on Dolly's appeal. Go ahead. Actually, I'll reserve the rest of the time. I'll address that in rebuttal. All right. Counselor Davis. Good morning, Your Honors. May it please the Court, Charles Davis for Dolly Wireless. Judge Reina, as you mentioned, there's a lot of moving parts in this case, but I thought it's best to start with your last point about waiver and the Section 112 issue on the 473 patent. What happened was that Comscope did not challenge this question of transmit below. In its reply brief here, it appears to agree with Dolly that this whole Section 112 argument is about the meaning of the term transmit. Now, instead, at Markman, they challenged transmit for whether it's an intended use or not. This is at Appendix 165 through 67. It shows the claim construction. But the important thing here, and I think this is what, Judge Reina, you were getting at, is that the jury was not presented with a claim construction about whether transmit requires this direct connection between the remote unit and the host unit. And that's at Appendix 101 through 106. This Court has made very clear that when a jury is not provided with a construction of the term, the jury applies ordinary meaning of the language. The only question is one of substantial evidence. And as Dr. Bims testified, and that Comscope had not refuted, there is disclosures in Columns 6 and 7 and 11 of the patent explaining how the host unit sends instructions to the remote unit, and that qualifies as transmit. The fact that Comscope, in its reply brief, disagrees with that interpretation of transmit does not mean that it's a different standard or that it's somehow a legal question. It's still a question of substantial evidence. And Comscope's failure to raise this below answers the question here about affirming. Now, Comscope also made a point about the bot, and this is in response to Judge Stoll's question about what same means. And this is a very technical question that goes a little bit to the disclaimer argument, but the same issue in SBOT goes to simulcasting. And the point of simulcasting is that a base station is connected to one remote unit, and that remote unit has to output everything from the base station. That's what simulcasting means. So when in the alleged disclaimer, and even in the discussion of SBOT, the question is about whether the SBOT only discloses sending out the entirety of the signal that comes from the base station, whereas the 473 patent is about sending subunits. And the host unit compiles all of the signals from the base station and sends out different subunits to different remote units. Counsel, this is Judge Stoll. What is the claim language that you're specifically relying on for this distinction? Yes, Your Honor. So there is both the language about the second subset being different than the first subset. There's no question that SBOT does not send different subsets to different remote units. Can I ask you something? Can we look for a second at that figure 6 in SBOT? In particular, I was looking at the version of the colors that's in the blue brief at page 83. So as I understand it, the signals that are coming in, the sector 1, sector 2, and sector K, they're different from one another, right? Correct, Your Honor. Okay. And then my understanding was that, you know, sector 1 could send – why doesn't that mean that the disclosure in this patent is that different signals coming in could be sent to any remote digital radio? You know, the element 510 could send any of those subsets coming in to 1, 2, and K to any of those remote digital radios that we see on the right-hand side of that figure. Why does that teach the idea that the second subset is different from the first subset? Yes, Your Honor. So two points on that. The first point is that, at most, this is a contested question between experts about Comscope's own annotation of a figure in the patent. Dr. Benz, at Appendix 28381 through 83, explicitly said to the jury that it did not agree with how Comscope annotated the figure, and the jury agreed. Okay, so let's set aside those annotations. Forget about the annotation. Okay. But, Your Honor, at bottom, what the 473 patent is disclosing is taking multiple subunits from a signal or multiple signals and sending them to different remotes. What Sabat is discussing is sending the exact same signal from a base station to possibly multiple remotes or only one remote. But the point of Sabat is sending the same signal to each one of them. It's not about turning this into parallel, which is... So is it your position, let's say the device that's marked 502 and it says Sector 1, could it send a signal to remote digital radio marked 504? 504. Yes. Well, Your Honor, that would depend on how the switches are lined up. But if it sent a signal to 504, it would be sending the exact same signal to the blue one that's right next to it and the blue one at the bottom. So the... And that was what Dr. Benz was explaining to the jury, is the difference between what's disclosed in Sabat and in the patent. And that's why he kept hammering home this point about simulcasting versus multicasting. Now... Can I ask one other question? Are these remote digital radios, they all could receive different signals from one another, right? On the right side of the page, there's nine of them shown. They could receive, you know, there's three different possible signals they could receive, right? At least three? Yes, Your Honor. Based on how the diagram looks, it appears that different. So like has... So one of the remote units could get that downlink free. But the point is, it could only receive the entirety of downlink free. And that's what simulcasting is talking about. What claim language do you rely on to the idea that the input to, say, sector one is not itself a subset of all the inputs to all of these different sectors? Why is that not a subset? Well, Your Honor, I apologize, but I think the point is that each one of the sectors is themselves a base station that sends out a full signal that's routed through the switches to specific remote units. I don't believe there's any disclosure or discussion about the remote units being connected together or being different subsets. The fact is each one of those sectors are themselves its own signal. And I think this dispute, this discussion we're having, is exactly the battle of the experts that the jury heard and justified affirming on that basis based on this court's view of substantial evidence. Was there a construction of the word subset? I do not believe so, Your Honor. And do you think the experts actually battled over the meaning of the word subset or what a subset is? Well, I don't think they battled directly over it, but I think that's implicit in the arguments between the parties and between the experts about why subot is anticipatory or not. Because, you know, COMSCO takes this view that a subset is anything sent out from a base station. That's how they annotated this. And Dr. Benz's response was, no, that's not what a subunit is. But I will admit, I don't think the two parties directly said, well, this is a subunit versus this is not a subunit. But I think that's at the heart of their dispute. Okay. Thank you. Now, Your Honor, and... Counselor, on the 521 patent, your friend on the other side says that you have, you're presenting contradictory arguments with respect to the invalidity determination and the anticipation arguments. What's your response to that? Your Honor, these are not contradictory interpretations. So, first of all, taking right, because that's what COMSCO started with. Does this come down to a battle of the experts as well? Yeah, well, Your Honor, I do believe it's a battle of the experts, but I think there's a very important point in right that needs to be brought out, and that's at Appendix 28278. Dr. Wood specifically states that the reason he chose right is because it doesn't have a controller. And he says in there, well, my view of Dr. Kenny's infringement theory is he didn't have to identify a controller, and because he didn't identify a controller, right would be anticipatory. And that's just not correct. Dr. Kenny made clear at Appendix 28011-12, 28047-49, that there is a controller. But even beyond that, Dr. Kenny explained to the jury, and we discussed this on pages 47-49 of our brief, about why RF-MUX does not meet the claim language, why it would not be anticipatory. And on the other hand, for the infringement theory, Dr. Kenny explained to the jury how the construction of the term, and specifically how the switching a controller to a non-operating state language would apply to a multiple power amplifier system. Now, Comscote's expert disagreed with that interpretation, but Comscote has not identified that that was somehow unreasonable or patently wrong interpretation of how you would apply this language to a multiple power amplifier system. And for that reason... Are you talking about the FlexWave system right now, or are you talking about right? FlexWave, Your Honor. Okay. So you're talking about the switch that's in the accused FlexWave, right? Do I understand correctly that what you're pointing to as being this claim element is the switch, the element that's marked FW in the figure at JA-28011? Well, Your Honor, to be clear, Dr. Kenny explained to the jury that there was a switch in this simplified diagram. And then he explained that there was also a controller connected to it. He said this to the jury, and then when pressed on it in cross-appeal, he explained again that there is a controller there. And importantly, he said that his infringement theory was predicated on the existence of this controller. And the controller is shut off? So as controller is shut off? As Dr. Kenny described to the jury that it would... Dr. Kenny explained to the jury that in the two-power amplifier system of the FlexWave, when one of the power amplifiers goes from the training phase to the operating phase, the controller and switch are placed in a non-operating state. Even though the other power amplifier is input, the switch is receiving input from the other power amplifier, right? Yes, Your Honor. And so it's a dispute over the meaning of the word off? Is that what you're saying? Well, it's interesting because the court did construe off, but it construed it with the term non-operating state. And I do think there could be a bit of ambiguity in how that applies. But Dr. Kenny explained to the jury how that ambiguity or how that claim language should apply to the FlexWave, and the jury agreed. Can you explain to me how a power amplifier is in a non-operating state when it's receiving... how a switch, excuse me, or even a controller for the switch is in a non-operating state when it's in fact receiving an input from a power amplifier? Well, Your Honor, in the FlexWave system, because it has multiple power amplifiers that share a controller and a switch, when one of the power amplifiers is in the operating phase, there's no use of the training phase circuit, and therefore the controller and switch are in a non-operating state while that power amplifier is going through its operating phase. So would you say that it's in a non-operating state with respect to the first power amplifier? Is that what your answer is? It's respective to whichever power amplifier you're talking about? Well, yes, Your Honor, but that comes naturally from the claim construction of the term power amplifier. And we explained this in our briefing on page 42 and 43, but the court construed that claim term to mean that infringement is shown by showing that one power amplifier goes through the training phase... Did you challenge that construction? Yes, Your Honor, that was a challenge. Oh, no, no, sorry, Your Honor. It was challenged at the beginning of Markman, but then by the end of Markman, the parties agreed that the claim construction required proof that at least one power amplifier goes through all three of the different stages. It has to be in a non-operating state. So you're not challenging that part? You're not challenging any of the court's claim construction of this term, right? No, Your Honor, we're not challenging the phrase non-operating state. What we're explaining is that Dr. Kenney applied that language to the multiple power amplifier system of the flex wave. It seems to me that even you're actually arguing against the construction. No. On appeal. Well, no, Your Honor. What we are arguing is that the way in which this term applies to a multiple power amplifier system is not as straightforward as... Your Honor, I think I'm in my rebuttal time. You can continue, yes. It's not as straightforward in a multiple power amplifier system as compared to a single power amplifier system. But Dr. Kenney still presented his discussion of this term and how it would apply to the jury, and the jury agreed with how Dr. Kenney established the elements of the claim. Okay. Do my colleagues have any additional questions? No. Okay. All right, Mr. Caspers, I mean, Mr. Davis, we thank you. Let's hear back from Mr. Caspers. Hello? Yes. Thank you, Your Honor. I was muted. Yes, just a few points. On the 473 patent, I heard counsel say that they agree that the ordinary meaning applies, but that's not what they're arguing now. Remember, the claim requires hosts to transmit subsets, and now I heard him say, well, the claim is directed to or suggest that the claim is directed to the concept of transmitting instructions. Well, the claim does not say transmitting instructions. It says transmitting subsets, subsets of the carriers. So that's on the 473. The next point relates to the 521. Remember, when they wrote this claim, they could have claimed just the result, disconnecting the feedback signal. But instead, they put a method step in of switching the controller off to get that result of disconnecting. Next point, infringement of the 521 patent is not a battle of the experts. Can I finish this point? Yes, please. Yes, go ahead. The court adopted the construction that switching it off means non-operating, and Dolly didn't appeal that construction. In fact, they conceded, as I pointed out at page 44 of our brief, that our controller is continuously operating. That's it. That's all I have, Your Honor. Thank you. Okay, thank you. Let's hear on the cross-appeal quickly. Thank you, Judge Reina. And if the court has any questions in particular about the cross-appeal, I'm happy to discuss them. But the basic concept of Dolly's cross-appeal argument is that Comscope adopted an interpretation of this term, indicative of, that would cover a narrow band of signal and gave that to the jury. The jury agreed. And by relying on that use of indicative of for its infringement analysis, it opens itself up to this challenge for lack of written description or enablement. And the important point here is that although Dr. Benz explained to the jury that nothing in the patent discloses any sort of filter that would narrow the band like a band pass filter, Dr. Akinpura's responses to the jury were either, one, this concept of maintaining the phase and amplitude, which as Dolly explained in page 13 of its reply brief, that is a necessary condition but not a sufficient condition. And additionally, this paragraph that Comscope identified on appendix A27244 where it stated that, well, there's some additional filters that must do it or the duplexer does it. This narrowing function. But as Dolly explained, those are non-responsive answers because none of those filters perform the sort of, or components, perform the sort of filtering necessary for the narrowing to support the language of indicative of that was used to convince the jury on infringement. And if the court has any further questions about the cross-appeal or any of the other issues, I'm happy to answer them now. Okay. Hearing none, we thank you for your arguments. We thank all the parties for the arguments. And we take this case under submission. Thank you, Your Honor.